# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

May 16, 2011

No. 10-70006

Lyle W. Cayce
Clerk

WILLIAM GERALD MITCHELL,

Petitioner - Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before JOLLY, CLEMENT, and ELROD, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In July 1998, William Gerald Mitchell was convicted and sentenced to death for the November 1995 capital murder of Patty Milliken. The Mississippi Supreme Court denied post-conviction relief, and the federal district court denied habeas relief and denied a certificate of appealability ("COA"). Mitchell has requested a COA from this court authorizing him to appeal the denial of relief on his claims that he received ineffective assistance of counsel and that he is mentally retarded and ineligible for execution. Because the district court's decision denying relief on these claims is not debatable among reasonable jurists

No. 10-70006

and Mitchell's claims are not adequate to deserve encouragement to proceed further, we DENY his request for a COA.

I.

On the evening of November 21, 1995, near the end of her shift, Patty Milliken told her co-worker at a Biloxi convenience store that she was going to go outside with Mitchell to smoke a cigarette and talk. She left her purse and car keys in the convenience store. When she did not return, her co-worker reported to the police that she was missing. Milliken had written Mitchell's telephone number on a piece of paper that the police found in her purse. The police cross-referenced the telephone number to an address. When they arrived at that address, Mitchell, who was in the yard, ran from them. The police later spotted Mitchell at a gas station, and pursued him when he fled from the gas station in his car. He was arrested for traffic violations.

Milliken's body was found the following morning under a bridge. She had been beaten, strangled, sexually assaulted, and crushed after having been run over by a car. After the police searched Mitchell's car, he was charged with Milliken's murder. At the time of Milliken's murder, Mitchell was under a sentence of life imprisonment for a previous murder, and had been on parole for approximately eleven months.

The jury found Mitchell guilty of capital murder. At the punishment phase, Mitchell called four witnesses. His wife, Mary Louise Mitchell, testified that she met Mitchell at the penitentiary. The last time he lived with her was in 1990 or 1991. She told the jury that they had adopted her son's child. She stated that Mitchell had a wonderful relationship with her adult daughters, and that he worked and took care of her children, allowing her to use some of his earnings to support them. She stated that he worked as a roofer, then as a direct care worker at the Mississippi State Hospital, and then went to truck

2

driving school and became a truck driver.  She said that Mitchell had never been violent to or around her.

Mitchell's stepfather, Albert Reed, Jr., testified that he married Mitchell's mother when Mitchell was four years old.  According to Reed, Mitchell was a normal youngster and everybody loved him.  Mitchell never had any problems with the law and worked for his grandfather's lawn business.  He testified that Mitchell served in the Army, and something happened to change Mitchell when he got back from Korea.

Mitchell's sister, Marie Cornelia Mitchell Dunn, testified that during their childhood, they did what normal children do, playing and going to school.  She said that Mitchell worked "all the time" when he was young.  She also testified about Mitchell's military service.  She admitted that she was aware that he had been convicted of murder in 1975.  She stated that her brother reads the Bible, and that is what has saved him:  "A person who has committed two murders reads the Bible and that's what he does everyday."[1]

Rosemary Reed, Mitchell's mother, testified that Mitchell had normal boyhood activities, and was "just a typical boy."  He was a Boy Scout and did normal things that Scouts do, such as camping.  She testified about his military service.  According to her, Korea was a bad place for him to be.  She testified about his conviction for murder in 1975 and his sentence of life imprisonment.

The jury did not find Mitchell's mitigating evidence to be persuasive, and he was sentenced to death.  The Mississippi Supreme Court affirmed his conviction and sentence on March 29, 2001, and denied rehearing on August 23,

---

[1] Mitchell argues that Dunn "blurted out" her testimony regarding the earlier murder because his trial counsel failed to prepare her for her testimony.  However, the fact that he was serving a life sentence and was out on parole at the time of Milliken's murder was already in evidence before Dunn testified.

No. 10-70006

2001. *Mitchell v. State*, 792 So. 2d 192 (Miss. 2001). The Supreme Court denied certiorari. *Mitchell v. Mississippi*, 535 U.S. 933 (2002).

The Mississippi Supreme Court denied post-conviction relief on August 19, 2004, and denied rehearing on December 2, 2004. *Mitchell v. State*, 886 So. 2d 704 (Miss. 2004). The Supreme Court denied certiorari. *Mitchell v. Mississippi*, 544 U.S. 1022 (2005).

Mitchell filed his federal habeas petition on June 15, 2005. On March 19, 2010, in a thorough and well-reasoned opinion, the district court denied relief and denied Mitchell's request for a COA. *Mitchell v. Epps*, No. 1:04-cv-865, 2010 WL 1141126 (S.D. Miss. Mar. 19, 2010).

II.

Mitchell requests a COA from this court authorizing him to appeal the denial of habeas relief on two issues: (1) whether he was denied the effective assistance of counsel during the guilt[2] and sentencing phases of trial; and (2) whether he is mentally retarded and entitled to an evidentiary hearing on that issue. We address the ineffective assistance claim first, and then turn to the mental retardation claim.

A.

Because Mitchell's ineffective assistance of counsel claim was adjudicated on the merits by the Mississippi Supreme Court, the district court's consideration of Mitchell's claim was governed by 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on

---

[2] Although Mitchell mentions the guilt phase in his COA request, his brief is focused solely on the punishment phase of the trial. Accordingly, he has abandoned his request for a COA as to ineffective assistance of counsel at the guilt phase of the trial. *See Hernandez v. Thaler*, 630 F.3d 420, 426 n.24 (5th Cir. 2011) (stating that petitioner abandoned issue not briefed in COA request).

the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For the district court, "[t]he pivotal question [was] whether the state court's application of the *Strickland* [*v. Washington*, 466 U.S. 688 (1984),] standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 788. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 786 (internal quotation marks and citation omitted).

The district court held that Mitchell's ineffective assistance claim was not exhausted in state court and consequently is procedurally barred from review, except for his claim that counsel failed to discover and present evidence of mental retardation at sentencing. It held that the Mississippi Supreme Court's denial of relief on Mitchell's *Strickland* claim was not unreasonable because Mitchell failed to show that he met the standard for mental retardation defined by state law and, therefore, his counsel could not be faulted for failing to present evidence of mental retardation. Assuming Mitchell's claim that his trial counsel should have offered evidence of other mental disorders were not barred, the

No. 10-70006

district court held that Mitchell was not prejudiced, because the evidence Mitchell claimed should have been presented was not of such persuasive character that it would have influenced the jury's appraisal of his moral culpability.

Mitchell has requested a COA from this court authorizing him to appeal the district court's denial of relief.   To obtain a COA, Mitchell must make "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *id.*, "or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El  v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted).   "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338.  In making the decision whether to grant a COA, this court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. The court cannot deny a COA because it believes the petitioner ultimately will not prevail on the merits of his claims. *Id.* at 337.  On the other hand, however, "issuance of a COA must not be *pro forma* or a matter of course." *Id.*  "While the nature of a capital case is not of itself sufficient to warrant the issuance of a

No. 10-70006

COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

In his COA request, Mitchell argues that his trial counsel rendered ineffective assistance by failing to investigate, discover, and introduce readily available mitigating evidence concerning his background and mental condition.

As the Mississippi Supreme Court recognized, Mitchell's ineffective assistance of counsel claim is governed by the clearly established law set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Mitchell v. State*, 886 So. 2d at 708. To have been entitled to relief from the Mississippi Supreme Court, Mitchell had to

> show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id*. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. at 689 (internal quotation marks and citations omitted).

With respect to the duty to investigate, which was at issue in *Strickland* and is the focus of Mitchell's claim,

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court recently stated that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 131 S. Ct. at 789-90. Mitchell's counsel were "entitled to formulate a strategy that was reasonable at the time

and to balance limited resources in accord with effective trial tactics and strategies." *Id*. at 789.

To demonstrate prejudice, Mitchell

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted).

"When a defendant challenges a death sentence, . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id*.

The Mississippi Supreme Court interpreted Mitchell's claim as one of ineffective assistance for failing to develop and present evidence of mental retardation at sentencing. *Mitchell*, 886 So. 2d at 708. The Court stated that there is no evidence in the record to suggest that Mitchell is mentally retarded. *Id*. The Court observed that the record showed that Mitchell had served four years in the military and had attended college, and that Dr. Matherne, who interviewed Mitchell for two hours after his arrest for murder in 1974, found that "it was obvious that [Mitchell] had at least average intellectual functioning and a significant deficit in cognitive functioning was not noted during the interview." *Id*. at 708-09. The Court concluded that, consequently, trial counsel could not "be faulted for failing to present mitigating evidence which did not exist." *Id*. at 709.

No. 10-70006

In federal court, Mitchell attempted to expand his claim to include counsel's failure to investigate and present evidence of mental illness. He alleged in his federal habeas petition that "[t]rial counsel breached his duty to investigate and present mitigating evidence and failed to investigate and present evidence of mental retardation and mental illness to the sentencing jury." In his brief in support of his federal habeas petition, Mitchell alleged that counsel unreasonably decided to forego any meaningful investigation and presentation of mitigating evidence in the following respects:

(1) Although Mitchell's first lawyer, Keith Roberts ("Roberts"), employed an investigator early in the pretrial period, he conducted no investigation of mitigating evidence;

(2) Mitchell's trial counsel, Keith Pisarich ("Pisarich") and Thomas Musselman ("Musselman"), failed to investigate and present any mitigating evidence to the jury during the sentencing phase except calling as witnesses four relatives in essentially naked pleas for mercy;

(3) trial counsel failed to use (or seek funds for) a mitigation expert to prepare a social history or otherwise evaluate Mitchell;

(4) trial counsel failed to conduct even a cursory investigation into Mitchell's personal background, including his records of military service, employment, prior penitentiary sentence, academic performance, and social history.

Mitchell alleged that, as a result of counsel's errors, the jury was not presented with evidence of his mental illness and mental retardation.

The district court concluded that, as presented to the state court, Mitchell's ineffective assistance of counsel claim based on trial counsel's failure to develop and present mitigating evidence at the penalty phase of the trial concerning Mitchell's mental condition was limited to evidence of mental retardation and did not encompass a claim that counsel rendered ineffective

10

No. 10-70006

assistance by failing to present mitigating evidence of his diminished mental capacity and mental illness. Accordingly, the district court held that Mitchell's ineffective assistance claim was exhausted in state court only insofar as he claimed that counsel failed to discover and present evidence of mental retardation at sentencing. It held that the Mississippi Supreme Court reasonably concluded that Mitchell failed to show that he met the standard for mental retardation defined by state law and, consequently, his counsel could not be faulted for failing to present evidence of mental retardation. Assuming Mitchell's claim that his trial counsel should have offered evidence of other mental disorders were not barred, the district court held that Mitchell was not prejudiced because the evidence Mitchell claimed should have been presented was not of such persuasive character that it would have influenced the jury's appraisal of his moral culpability.

1.

Mitchell argues that the issues he raised in state court encompassed mental health mitigating evidence, as well as mental retardation mitigating evidence. Mitchell asserts that his claim that trial counsel rendered ineffective assistance by failing to gather records, locate witnesses, ensure that Mitchell received an adequate mental health evaluation, and investigate all mitigating evidence concerning his mental condition, family life and personal circumstances, was fairly presented to the state court and thus exhausted.

A thorough review of Mitchell's state court filings convinces us that reasonable jurists would not find debatable the district court's conclusion that Mitchell failed to exhaust his ineffective assistance claim with respect to evidence other than evidence of mental retardation.

In his state post-conviction application, under the heading "Grounds for Ineffective Assistance of Counsel Claim," Mitchell described the issue as "Failure to Investigate and Present Evidence of Mental Retardation to Sentencing Jury."

11

No. 10-70006

On page three, under the heading "Preservation of Issues," the application states that "trial counsel failed to properly investigate and present mitigating evidence at trial concerning Mitchell's mental health problems. Mitchell would submit that he is mentally retarded as contemplated in the United States Supreme Court case of *Atkins v. Virginia.*" On page 15, Mitchell alleged that "[c]ounsel's performance fell below the effective standard since they failed to investigate the defendant's mental health background, which may have shown that he was 'borderline mentally retarded' or other significant mental health illnesses." The petition alleges that "[e]ven a cursory examination of Mitchell's childhood school records, military records, the findings of prior mental evaluations, employment records together with other psychiatric and psychological records would have readily revealed potent mitigation matters for the trial jury's consideration." Specifically, "[t]he records would have revealed to trial counsel that Mitchell had been previously diagnosed on more than one occasion as being mildly mentally retarded." The petition goes on to describe how the referenced documents demonstrate that Mitchell's intelligence is in the range covered by *Atkins*, and that he has adaptive deficits. On page 18, he alleged that "[t]rial counsel had a duty to investigate his mental illnesses and mental retardation. Trial counsel was neglectful and they failed to do so and as a result, the trial jury never had an opportunity to consider evidence of mental retardation as mitigation."

Mitchell also alleged in his state post-conviction petition that "[t]here was an abundance of relevant, significant and material mitigating evidence to have been obtained from Mitchell's family members and official records but defense counsel failed to take the time to investigate or interview or offer any of them." He claimed that "[p]roper investigation and presentation of the testimony of the relevant family members and the testimony of just one mental health expert could easily have persuaded the trial jury to return a life sentence."

No. 10-70006

In his reply brief filed in the post-conviction proceedings before the Mississippi Supreme Court, Mitchell argued again that "trial counsel failed to properly investigate and present mitigating evidence . . . concerning Mitchell's mental health problems." He argued that his propensity to become involved in physical altercations, his undependability as a worker, and his discharge from the Army due to unsuitability were indicia of mental retardation and adaptive skills deficits.

As noted, the Mississippi Supreme Court interpreted Mitchell's claim as one of ineffective assistance for failing to develop and present evidence of mental retardation at sentencing. *Mitchell*, 886 So. 2d at 708. In his motion for rehearing of the denial of post-conviction relief filed in the Mississippi Supreme Court, Mitchell did not claim that the Mississippi Supreme Court had misunderstood or misinterpreted his claim by limiting it to the failure to present evidence of mental retardation. He asserted that "counsel was ineffective in failing to investigate and present mitigating evidence concerning his mental health history in support of his mental retardation claim." On page 27, he stated that "[c]ounsel's performance fell below the effective standard since they failed to investigate the defendant's mental health background, which may have shown that he was 'borderline mentally retarded' or other significant mental health illness." On page 30, he alleged, in a conclusory fashion, that counsel's "failure to investigate and interview family members, as well as other witnesses, expert and lay, does not equate to sound trial strategy." On page 31, he stated that "trial counsel had a duty to investigate his mental illnesses and mental retardation. Trial counsel was neglectful and . . . they failed to do so and as a result, the trial jury never had an opportunity to consider evidence of mental retardation in mitigation." He also alleged, again conclusorily, that there was "an abundance of relevant, significant and material mitigating evidence to have been obtained from his family members and official records, but defense counsel

13

No. 10-70006

failed to take the time to investigate or interview or offer any of them." He did not offer any description of the evidence that supposedly could have been obtained from the family members.

Based on the foregoing, the district court's conclusion that Mitchell's claim in state court centered on the failure to investigate and present mitigating evidence of mental retardation, and was not a claim of a general failure to investigate and present any mitigating evidence, is not reasonably debatable. Although Mitchell mentioned mental illness and made reference to the documents attached as exhibits to his state post-conviction petition, he made no argument with respect to the contents of those documents other than as proof of mental retardation. Further, although he complained about counsel's failure to interview family members, he did not provide any details about what they could have testified to if interviewed and called as witnesses.

Even assuming, however, that Mitchell's ineffective assistance claim regarding evidence of mental illness is not barred, the district court's alternative conclusion that Mitchell was not prejudiced by counsel's failure to present evidence of mental illness is not reasonably debatable. We now turn to discuss the evidence of mental retardation and mental illness that Mitchell claims should have been presented at trial.

2.

Mitchell was initially represented by Roberts and Musselman. After Roberts withdrew, Pisarich replaced him. Pisarich and Musselman represented Mitchell at trial. On March 18, 1998, prior to trial, Mitchell's counsel filed a motion to have him examined by a psychiatrist. Attached to that motion were copies of Mitchell's prior mental evaluations by various mental health professionals. The trial court granted the motion and the evaluation was conducted by Dr. Maggio on March 20, 1998. Dr. Maggio concluded that Mitchell was not schizophrenic, psychotic, or mentally retarded.

14

No. 10-70006

Mitchell contends that this psychiatric evaluation was inadequate because it was done solely to determine whether he knew right from wrong and was competent to assist in his defense. Further, the evaluation relied heavily on Mitchell's self-reporting during a two-hour interview. Dr. Maggio noted that Mitchell reported that he had previously been in drug rehabilitation, had abused drugs while in the military, and was under the influence of drugs on the night of Milliken's murder. Mitchell asserts that Dr. Maggio's reliance on Mitchell's self-account of his life history, without probing into specifics in his personal background and without access to previous psychological evaluations, including those from Mitchell's previous penitentiary stay, was inadequate to discover mitigating evidence.

Mitchell asserts that the only mitigating evidence offered at the punishment phase of his trial was testimony from some family members who asked for mercy. He complains that his counsel did not present to the jury any substantive evidence or insight into his psychological problems, his history of failures at school, with his relationships, and during his military service and employment history. According to Mitchell, the key to his ineffective assistance claim is that trial counsel never investigated any aspect of his mental condition, either for retardation or mental illness and, therefore, no such evidence was available to present in mitigation at the penalty phase of his trial.

Mitchell contends that a proper mitigation investigation would have revealed numerous records, including grade school records, college records, employment records, records from the Mississippi State Hospital, and other psychological records, including those from the Mississippi Department of Corrections and a drug and alcohol rehabilitation facility. A description of the documents Mitchell claims his counsel should have discovered and presented to the jury follows:

No. 10-70006

Dr. Bass:   Mitchell was seen by Dr. Bass on April 10, 1974, for a psychiatric evaluation after he had been charged with the murder of a family friend and the assault with the intent to murder the victim's daughter. Dr. Bass stated that Mitchell "is coherent, he is aware of the consequences of his actions, he is intellectually able to stand trial; however, I consider him to be a borderline schizophrenic, potential for decompensation into a psychotic state, under stress." Dr. Bass stated that the paranoid feelings that Mitchell described on returning to school and the circumstances of Mitchell's situation led him to believe that Mitchell was probably psychotic at the time of the murder and was not able to distinguish between right and wrong.

Dr. Matherne:   In a June 26, 1974, report of psychological evaluation, Dr. Matherne stated that Mitchell's intellectual functioning appears to be in at least the average range of intelligence. Dr. Matherne stated that a formal intellectual evaluation was not conducted because it was obvious that Mitchell had at least average intellectual functioning and a significant deficit in cognitive functioning was not noted during the interview. The fact that Mitchell had attended college also supported Dr. Matherne's impression that Mitchell has at least average intellectual ability. Mitchell had been referred to Dr. Matherne to determine whether Mitchell was then or had at any time in the past functioned on a psychotic level. Dr. Matherne's report noted that Mitchell had been charged with murder and assault with intent to murder for stabbing to death a woman in his neighborhood and assaulting the woman's daughter. Dr. Matherne stated that Mitchell may have functioned on a psychotic level in the past and that he appears to have a borderline schizophrenic process which, when precipitated under stress, results in his inability to engage in appropriate reality testing and that he may experience a loss of memory for his actions.

Mississippi State Hospital Records:   Mitchell was admitted to the Mississippi State Hospital on February 11, 1975, on order of the Harrison

16

County Circuit Court. He was facing charges of murder and assault and battery. Mitchell's diagnosis following the 1975 psychological evaluation at the Mississippi State Hospital was "mild mental retardation" and schizophrenia, latent type. In a report dated March 20, 1975, Dr. Stanley, a staff psychologist, stated that Mitchell may be borderline psychotic. Dr. Stanley noted that on the Wechsler, Mitchell obtained a full scale IQ score of 79, which he characterized as representing "borderline mental retardation." Dr. Stanley's report states that Mitchell's drawings "suggest a considerable amount of hostility, especially where women are concerned."

These records also contain additional information of questionable mitigating value, some of which could have been damaging to Mitchell at the penalty phase of his trial. They contain details about his arrests for assault and battery on July 23, 1973, and November 11, 1973. In both of the prior assaults, the female victims were beaten; one apparently suffered a broken jaw and wrist. Mitchell is described in these records as "arrogant" and "quite hostile, belligerent and very evasive." The records contain information about Mitchell and another inmate collaborating on a possible damage suit and being confined because of a disturbance that could have been quite violent. In addition, the records contain damaging information about the 1974 stabbing murder of a female family friend and the stabbing of her daughter. The notes reflect that, at some point during the stabbing, the knife that Mitchell was using broke, and he got another one. The notes indicate that the stabbing victim was "cut, cut, cut to pieces." The records also contain a report that Mitchell's own grandmother said that she had become afraid of him during the last few years.

Mississippi State Penitentiary Records: Staff psychiatrist Dr. Croce interviewed Mitchell in 1977 and stated that he seemed to function in the dull-normal level of intelligence, but that his fund of general knowledge was not in keeping with his college education. He noted that tests showed that Mitchell

No. 10-70006

was reading at grade level 7.9, spelling at grade level 8.7, and arithmetic was 4.9. Dr. Croce stated that Mitchell should be watched carefully for sudden changes in his behavior, as he can become extremely aggressive and destructive, especially toward others if he feels threatened in his insecurity. Dr. Croce's report also mentions that Mitchell has had problems fighting with other inmates and had been disciplined several times for assaultive behavior. He described Mitchell as "unusual and bizarre."

Dr. McGlynn, a psychologist, reported that Mitchell's full-scale IQ on the short form Wechsler Adult Intelligence Scale is 83 (Verbal, 76, Performance, 94). He stated further that the results of testing suggested the presence of major psychiatric involvement and that Mitchell may be "clinically psychotic with a picture of schizophrenia, paranoid type."

Military Records:   Mitchell served in the Army from 1969 until 1973 as a supply clerk and a welder. While in the Army, he earned the National Defense Service Medal, the Expert Rifle Medal, and the Armed Forces Expeditionary Medal. Mitchell received "excellent" ratings for conduct and efficiency from February 1969 until May 1969. Thereafter, he received "satisfactory," "excellent," or "good" ratings in conduct and efficiency through February 1971, with one "fair" rating for conduct. After February 1971, his performance deteriorated. Mitchell was discharged from the Army for "unsuitability" on December 12, 1972. Sergeant First Class Dunham found that Mitchell "overall was not a competent soldier," and described his disrespectful behavior to others. Staff Sergeant Rodgers noted that Mitchell's behavior further declined when his wife left him, and mentioned Mitchell's "personal problems," for which Sergeant Rodgers gave him time off. Sergeant Rodgers observed that Mitchell was a "daily problem for me" and that his "adaptability, attitude, initiative and responsibility are way below average." Major Orendas provided a statement indicating that Mitchell had separated from his wife for infidelity. Major

18

No. 10-70006

Orendas cited disciplinary problems, including involvement in physical altercations with other soldiers (kicking one soldier and hitting a different one in the face with his fists) and disrespect for officers. Major Orendas characterized Mitchell as "an arrogant individual in complete dissidence to the discipline required of members of a uniformed service and . . . completely incorrigible." Major Orendas noted that Mitchell had not reformed his behavior after opportunities for rehabilitation and that the unsatisfactory behavior had occurred in previous assignments in Europe and Korea.

Mitchell complains that, instead of exploiting the evidence of subnormal intelligence and performance documented in his military records, counsel favorably cited to Mitchell's Army service, without access to the records themselves. However, if Mitchell's military service records had been presented to the jury, the jury would have learned that his discharge was for refusal to obey orders, attacking other soldiers, and dereliction of duty. The records also reflect that he was trained as a welder, which some jurors might have considered to cast doubt on a claim of mental retardation.

School Records:    Mitchell's school records, obtained by his post-conviction counsel and attached to his state post-conviction petition, reflect that he attended school through the eleventh grade without failing a grade until the second semester of the tenth grade. He was not in any special education classes. His grades were in the 70s, with some 80s in the sixth grade. He participated in football, basketball, and choir. He earned his GED while in the Army. Mitchell was accepted at Mississippi Valley State University in January 1974, where he enrolled in biology, art, history, and psychology classes. He attended classes for only about a month before he withdrew after he was arrested for aggravated assault and murder.

Employment Records:    After his discharge from the Army, Mitchell worked at Manpower as a welder. He also worked at Ingalls shipyard as a

shipfitter and then as a tacker apprentice for two or three months. He resigned because he was dissatisfied with working conditions. On his job application, he indicated that he had attended welding school at a local community college. When Mitchell was on parole in 1989, he worked for the Mississippi State Hospital as a Direct Care Trainee and then as a Direct Care Worker. He also worked as a truck driver for J. B. Hunt in 1990, which the State claims presumably would have required him to obtain a commercial driver's license.

In support of his state post-conviction application, Mitchell submitted the affidavits of Dr. Sarah DeLand, Dr. Gwendolyn Catchings-Costello, and Dr. W. Criss Lott. Dr. DeLand stated that, based on her review of the materials obtained by Mitchell's post-conviction counsel, there were "a number of areas that suggest the presence of mitigating factors and require further exploration." She concluded that Mitchell "may suffer from a neurological dysfunction," and that a "thorough forensic psychiatric evaluation is necessary." Dr. Catchings-Costello, a family friend, stated that Mitchell was a poor student and had no realization of the consequences of his actions. Dr. Lott's affidavit stated that Dr. Maggio did not perform a full forensic evaluation to assess for mitigating circumstances, and that such an evaluation, including neuropsychological and intelligence testing, is necessary.

Mitchell also submitted to the state court the affidavits of his trial counsel, Pisarich and Musselman. In his affidavit, Pisarich stated that he did not use the services of an investigator, but he noted that Mitchell's former attorney, Keith Roberts, had used an investigator. Pisarich said that he did not have the services of a mitigation specialist or a social worker to look into Mitchell's background and that he did not obtain Mitchell's school records or military service records. He was, however, aware of Mitchell's psychiatric problems and said that, in hindsight, he should have looked into it more closely. He stated that he interviewed witnesses called to testify in mitigation at trial, but that no

investigation was made as to people who may have known Mitchell during his incarceration at Parchman on his former conviction.[3] He stated that he had no information as to Mitchell's family background except for what he learned in discussions he had with Mitchell, his mother, and the other mitigation witnesses.

Pisarich's co-counsel, Musselman, submitted an affidavit in which he stated that they performed no investigation into any mitigating circumstances; they did not seek any mental health records, school records, or military records; and no time was set aside to prepare Mitchell's family members for the testimony in the penalty phase. Musselman indicated that, as a result of this lack of preparation, Mitchell's sister, during her testimony at the punishment phase, blurted out that he had committed a prior murder. As we have already noted, however, the fact that Mitchell had been sentenced to life imprisonment and was on parole at the time he murdered Milliken was already in evidence before the sister testified.

Although Mitchell alleges that his trial counsel failed to investigate and discover these records, it is clear that trial counsel had at least some of them, because they were attached to the motion for a psychiatric examination.[4] Specifically, attached to that motion were Dr. Matherne's reports of June 26,

---

[3] Apparently there are no people who knew Mitchell during his incarceration at Parchman on his prior murder conviction who could have provided mitigating evidence; at least, his post-conviction counsel did not identify any such individuals or describe what they might have said had they been called to testify.

[4] There is additional evidence that Mitchell's counsel were aware of the contents of Mitchell's records of prior mental health examinations. At a motion hearing in 1998 after Pisarich was appointed, the trial court and Pisarich were talking about Mitchell's prior convictions and the court mentioned Mitchell's examination by the Gulf Coast Mental Health Center. Pisarich replied, "Yes, Your Honor. We have gone over all that, and I have a complete copy of those files." The Court then asked Pisarich about Mitchell going to the Mississippi State Hospital, and Pisarich indicated his familiarity with Mitchell's examinations by Dr. Bass and Dr. Matherne prior to going to the Mississippi State Hospital.

1974 and August 14, 1974; the June 26, 1974 report of Dr. Bass; and the April 30, 1975 report from the Mississippi State Hospital which mentions a diagnosis of "mild mental retardation." Further, those records were summarized in Dr. Maggio's report issued following that examination. Dr. Maggio's report summarized most of Mitchell's prior mental health evaluations, his criminal history, and his drug use. Dr. Maggio concluded that Mitchell was not schizophrenic, psychotic, or mentally retarded. If Mitchell's counsel had presented the records that Mitchell contends they should have presented, the State would have been able to rebut with Dr. Maggio's testimony.

> Although courts may not indulge *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect. After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 131 S. Ct. at 790 (internal quotation marks and citations omitted). *See also Pinholster*, 131 S. Ct. at 1407 (citing with approval Chief Judge Kozinski's dissenting opinion below in which he stated that the court of appeals was required "to affirmatively entertain the range of possible reasons" that counsel may have had for proceeding as they did).

The record shows that Mitchell's counsel's failure to pursue the investigation that, in hindsight, they seem to think they should have done, is consistent with their overall strategy of trying to keep from the jury the damaging details of Mitchell's prior assaults against women. Counsel were defending their client against the death penalty for the brutal murder of a

woman, committed less than a year after he was released on parole for the brutal stabbing murder of another woman who was a family friend. His criminal record also included violent assaults against three other women. The record shows that counsel were aware of Mitchell's prior psychological evaluations, including the fact that those records contained details of the prior murder and assaults that could have been damaging to their effort to save Mitchell's life. They were also aware that Dr. Maggio had examined Mitchell and found that he was not schizophrenic, psychotic, or mentally retarded. Under these circumstances, they reasonably could have decided that it was best to emphasize the positive aspects of Mitchell's military service and to prevent the jury from learning anything more than the bare fact that he previously had been convicted of murder and assault. Mitchell's evidence of mental retardation is so weak, and is contradicted by so much other evidence, that his counsel reasonably could have decided that the jury simply would not believe it. Counsel might also reasonably have concluded that the evidence of mental illness contained damaging information that a jury might have relied on to conclude that Mitchell was incapable of rehabilitation.

Even assuming that Mitchell's counsel performed deficiently, reasonable jurists would not find debatable the district court's conclusion that Mitchell was not prejudiced by his counsel's failure to present this information, and the other evidence that Mitchell claims they should have presented from his school, military, and employment records, to the jury. As the district court pointed out, some of those documents contained damaging information that would not have been helpful in attempting to persuade the jury to spare his life. Those records show that Mitchell was involved in physical altercations while at the Mississippi State Hospital and while in the Army. He was not a dependable worker because of repeated absences from his employment. He had a history of drug abuse. He is described in these documents as arrogant, hostile to women, evasive,

incorrigible, negative, defiant, manipulative, aggressive, and destructive. He was discharged from the Army as unsuitable, because of misconduct such as refusing to obey orders, disrespecting officers, and beating and kicking other soldiers. The documents also contain details about the first murder Mitchell committed in 1974, in which he used two butcher knives to kill the victim, because the first knife broke. The murder victim was described as having been "cut, cut, cut to pieces." During that same incident, Mitchell also stabbed the victim's daughter. Furthermore, the reports describe two earlier assaults Mitchell committed against women. Although Mitchell's school records do not contain any damaging information, the district court reasonably concluded that there is nothing in those records that establishes any sort of disorder that might have persuaded jurors to impose life imprisonment rather than the death penalty.

The district court reasonably rejected Mitchell's claim that trial counsel rendered ineffective assistance by failing to properly investigate the information known by the testifying family members and by failing to elicit such mitigating testimony from them by ineffectively questioning them. Mitchell has not presented any affidavits of any family members who state that he is mentally retarded or describe testimony they could have presented that was different from what they testified to at trial. In the state post-conviction proceedings, Mitchell stated that he had attempted to obtain affidavits from the witnesses called at trial in mitigation, but was only able to obtain an affidavit from Mary Mitchell, his ex-wife. Mitchell argues that her affidavit shows a complete lack of trial preparation for mitigation. However, one portion of her affidavit undercuts his claim of mental retardation: she stated that she still has and uses Mitchell's Bible. She stated that as she "read some of the passages he wrote in the margins of the Bible, I really believed that he was serious and that he could have become a minister." Mitchell argued that if his daughter-in-law, Andrea Mitchell, had

24

No. 10-70006

been contacted, she would have testified about Mitchell's "many good traits." However, Andrea Mitchell did not submit an affidavit, and the only support for her purported testimony is the hearsay affidavit of post-conviction counsel's investigator, Tomika Harris.[5]

In sum, reasonable jurists would not find debatable the district court's denial of relief on Mitchell's ineffective assistance of counsel claim, and Mitchell has not shown that this claim is adequate to deserve encouragement to proceed further. We therefore deny his request for a COA on his ineffective assistance of counsel claim. We now turn to consider whether Mitchell is entitled to a COA for his claim that he is mentally retarded and thus ineligible for execution.

B.

The Mississippi Supreme Court held that there is no evidence in the record to suggest that Mitchell is mentally retarded. 886 So. 2d at 712. Furthermore, the Court held that Mitchell had not made the showing required by *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004), to be entitled to an evidentiary hearing: he did not produce an affidavit from any expert stating that he had an IQ of 75 or below and that in the expert's opinion further testing would show him to be mentally retarded. *Mitchell*, 886 So. 2d at 712.

The district court held that the Mississippi Supreme Court's decision that Mitchell had not established that he is mentally retarded and had not made the showing necessary under state law for an evidentiary hearing is not contrary to, or an unreasonable application of, clearly established federal law. A thorough review of the entire record convinces us that reasonable jurists would not find the district court's decision to be debatable.

---

[5] Mitchell's alternative claim of ineffective post-conviction counsel was not presented to the state court or to the district court and is barred in any event by *Stevens v. Epps*, 618 F.3d 489, 502-04 (5th Cir. 2010), *cert. denied*, ___ S. Ct. ___, 2011 WL 1225748 (Apr. 4, 2011).

Mitchell did not present an affidavit from an expert stating that he had an IQ of 75 or below and that further testing would show that he is mentally retarded. Mitchell relies on the diagnosis of mild mental retardation that he received from Mississippi State Hospital in 1975. Although a summary sheet from the Mississippi State Hospital indicates that Mitchell was diagnosed with "Mild Mental Retardation," the case notes state that "all members of the staff agreed on a diagnosis of Borderline Mental Retardation." Mitchell's IQ score of 79, however, does not support a diagnosis of mental retardation. Instead, according to the DSM-IV-TR, the term "borderline intellectual functioning" is used to describe an IQ range of 71-84, which is higher than that for Mental Retardation (an IQ of 70 or below). AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 42, 740 (4th ed. 2000).

Mitchell claims that Biloxi Public School records show that he registered IQ scores of 71, 74, 76, and 65. The State contends that these were merely sub-test scores rather than full scale IQ scores. The district court found the records inconclusive because the scores were unexplained. Our review of those records supports the district court's conclusion. Moreover, the Biloxi Public School records show that at age nine Mitchell scored 77 on an IQ test. Further, in 1977, when Mitchell was twenty-seven years old and serving his sentence for his first murder conviction, he obtained an IQ score of 83.

The record also contains very little evidence of deficits in adaptive functioning. Mitchell's stepfather testified that he was a "normal" youngster, who went to school and was loved by everyone. His mother testified that he was a Boy Scout and had been "just a typical boy." Family members testified that he was in the Job Corps and also worked for his grandfather's lawn service. Mitchell has not presented any affidavits from any family members who state that they would have testified that Mitchell is mentally retarded.

The Biloxi Public School records show that Mitchell passed Personal Development with grades of 90 and 95, and also passed classes such as Spanish, Speech, Algebra, and Shop. In high school, Mitchell played football and basketball and sang in the choir. Mitchell's family reported that he completed his tests early in the fifth and seventh grades. In 1974, Dr. Bass reported that Mitchell had "no trouble learning" in high school. Mitchell obtained a GED while serving in the Army.

The Mississippi State Hospital case notes indicate that Mitchell interacted well with the other patients there and that he played basketball and participated in recreational activities. While at the Mississippi State Penitentiary, Mitchell boxed and played football and basketball.

The record also contains evidence that Mitchell maintained adult relationships. He had girlfriends; he was married while in the Army and fathered a child before divorcing after three years of marriage; and he later married another woman and adopted a child.

Mitchell submitted handwritten requests for medical attention at the Mississippi State Penitentiary. On one request, he stated that his eyes had "deteriorated." On another, he correctly spelled "hemorrhoid."

Our review of the entire record reveals much more evidence that undermines Mitchell's claim that he is mentally retarded.

The state court record contains numerous handwritten letters and pleadings from Mitchell. In addition, his trial counsel essentially re-filed all of the *pro se* motions that Mitchell had previously filed, and incorporated and attached his *pro se* filings to the motions that they filed on his behalf. At a hearing in October 1996, the trial judge asked Mitchell why he had filed a *pro se* speedy trial motion. Mitchell responded, "I thought I had a right to file, Your Honor." When the court asked who helped him file the motion, Mitchell replied, "I did it myself, Your Honor." The trial judge asked Mitchell if he had read

27

*Barker v. Wingo*, and Mitchell replied that it was a speedy trial case and that he had read some of it.

Mitchell testified at the suppression hearing, before Pisarich replaced Roberts as his lead counsel. At the conclusion of the hearing, he asked the judge if his taped statement was going to be admitted into evidence. He stated that if the tape was going to be submitted to the jury, the portion of the tape in which he says that he is a parole violator should be taken out. He cited in support the Mississippi Supreme Court case of *Taylor v. State*. After Pisarich was appointed, he took up this identical argument, citing the very same authority that Mitchell had cited.

At a speedy trial motion hearing in July 1998, the Court asked Mitchell about his speedy trial motion and the motion to dismiss Roberts as his counsel, and Mitchell replied, "It wasn't a written motion, I did it ore tenus." When testifying at that hearing, Mitchell indicated his understanding that if he testified about matters covered by the attorney-client privilege between him and his former attorney, Roberts, the prosecutor could cross-examine him about it. In response to the court's question about whether he had ever asked in open court for a speedy trial, Mitchell replied: "No, sir. And the reason I didn't do that is because the little case law that I read concerning speedy trial, the Mississippi Supreme Court and the United States Supreme Court and the federal courts said that once the defendant makes a demand for a speedy trial you don't need to bring it up anymore. And then it's not – and the law also says that it's not the defendant who's to bring it to trial, it's the State to bring the defendant to trial."

At the conclusion of the State's case in chief at the guilt phase of the trial, the court addressed Mitchell about his decision not to testify. During that colloquy, the court asked Mitchell if anyone had helped him file his *pro se* motions, and Mitchell said no, that he did it himself, using resources from the

No. 10-70006

law library at the detention center. Pisarich stated that he had visited with Mitchell at the Harrison County Jail approximately 25 to 30 times since he had been appointed and that they discussed trial strategy, as well as many other things. He stated that Mitchell's decision not to testify was not made on the spur of the moment and had been well-discussed.

In a January 11, 2000 motion for leave to file an amended brief, Mitchell's counsel stated that Mitchell had called counsel about the contents of his brief on direct appeal. Apparently Mitchell was very dissatisfied with the contents of the brief and had specifically requested that his counsel add certain additional matters. The motion goes on to state that, after consideration, counsel believes that the additional matters should be added to the appellant's brief.

In a handwritten letter to the district court, Mitchell asked for the name of the attorney who had been appointed to represent him in federal habeas proceedings. The letter includes the docket number of his case and states that he needs to know the name and address of his attorney because his federal habeas petition is due on April 18, 2005, and he has not heard from his attorney.

Based on the foregoing, we conclude that reasonable jurists would not find debatable the district court's conclusion that the Mississippi Supreme Court's decision that Mitchell had not established that he is mentally retarded and had not made the showing necessary under state law for an evidentiary hearing is not contrary to, or an unreasonable application of, clearly established federal law. We therefore deny Mitchell's request for a COA authorizing him to appeal the denial of relief on his mental retardation claim.

III.

For the reasons stated above, we DENY Mitchell's request for a COA.

COA DENIED.